IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARBARA JORDAN                         :
                                       :        CIVIL ACTION
        v.                             :
                                       :        NO. 10-3470
SOUTHEASTERN PENNSYLVANIA              :
TRANSPORTATION AUTHORITY               :
and MICHAEL KELLY                      :


**<u>MEMORANDUM AND ORDER</u>**

Plaintiff in this matter, Barbara Jordan, is an African American former bus operator for

Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA").  Defendant Michael

Kelly (collectively with SEPTA, "Defendants") was Ms. Jordan's former supervisor.  Jordan

brings race and gender discrimination and retaliation claims against the Defendants under Title

VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act, 43

Pa. Cons. Stat. Ann. §§ 951-963 ("PHRA"), race discrimination and retaliation claims under

42 U.S.C. § 1981, and claims for the violation of the First, Fourth, and Fourteenth Amendments

pursuant to 42 U.S.C. § 1983.[1]

Presently before the court are Defendants' Motion for Summary Judgment (Doc. 32),

Plaintiff's Response in Opposition thereto (Doc. 37), Defendants' Reply (Doc. 46), and both

parties' letter briefs in response to the court's request for supplemental briefing (Docs. 48, 50).

For the reasons detailed herein, Defendants' motion will be granted in part and denied in part.

---

[1] Ms. Jordan's claims for violation of the Family and Medical Leave Act, and for
wrongful termination in violation of the Pennsylvania Workers Compensation Act were
previously dismissed.  (<u>See</u> Docs. 10, 23.)

## I.  FACTUAL BACKGROUND

Ms. Jordan, commenced employment with SEPTA as a Bus Operator in 1993.  (Defs.'

Statement of Uncontested Material Facts In Support of Their Mot. for Summ. J. ("Defs.' Facts")

¶ 1; Pl.'s Resp. and Opp'n to Defs.' Statement of Uncontested Material Facts ("Pl.'s Resp.") ¶ 1.)

After an injury in 1999, Ms. Jordan was temporarily reassigned, but she returned to her job as a

Bus Operator in April 2006 and was assigned to SEPTA's Southern District.  (Defs.' Facts ¶ 2;

Pl.'s Resp. ¶ 2.)  Defendant Michael Kelly was Director of Transportation at the Southern

District, and Ms. Jordan's direct supervisor, from 2007 through July 2009.  (Defs.' Facts ¶ 3;

Pl.'s Resp. ¶ 3.)  The following actions taken by the Defendants and complaints made by Ms.

Jordan make up the substance of Ms. Jordan's claims:

### The January 2007 "Pole Dancing" Remark

▸  In January 2007, while standing outside Mr. Kelly's office, Mr. Kelly's assistant, Phil Hufnagle, commented on Ms. Jordan's attire.  When Ms. Jordan entered Mr. Kelly's office, Mr. Kelly stated, "The next time Phil says something about what you're wearing, tell him that's what you wear when you go pole dancing."  (Defs.' Facts ¶ 5; Jordan Dep. 22:1-19, May 11, 2011.)

### Ms. Jordan's September 27, 2007 Complaint

▸  On September 27, 2007, Ms. Jordan filed a complaint with SEPTA's Equal Opportunity/Affirmative Action ("EEO/AA") Office.  (Defs.' Ex. 4.)  The complaint stated that SEPTA employee Charlotte Carpenter whose duties included arranging for busses to leave the depot in an orderly fashion, was misusing her authority and harassing Ms. Jordan.  (Id.)  Specifically, Ms. Jordan complained that Ms. Carpenter "show[ed] favoritism tow[ard] some and dislike towards others" by giving newer busses in better positions in the depot to people she liked, including someone she dated.  (Id.)

▸  SEPTA's Manager of Employee Relations, Thomas Comber, investigated Ms. Jordan's complaint and determined that the complaint did not involve discriminatory treatment or harassment.  (Defs.' Ex. 5.)

2

**The December 3, 2007 Removal From Service**

▸  On November 30, 2007, Ms. Jordan blacked out while operating a bus.  (Jordan Dep. 52:8-53:13.)  She was hospitalized overnight and released.  (Id. at 53:14-55:1.)

▸  During her next shift, on December 3, 2007, her supervisor, Mr. Kelly, removed her from service for the first half of her shift.  (Id. at 55:2-57:24.)  She returned to work for the second half of her shift and does not recall whether her pay was withheld for the time she was out of service.  (Id. at 58:1-16.)

▸  Mr. Kelly testified that he removed her from service because he had not yet been informed that she had been medically cleared to work.  (Kelly Dep 38:17-22, May 10, 2011.)  He wrote to SEPTA's Medical Director inquiring about Ms. Jordan's clearance for work, and noted that "[s]he has called every office we have to file her harassment complaint."  (Pl.'s Ex. 3.)

▸  Also on December 3, 2007, Ms. Jordan telephoned SEPTA's EEO/AA Office to inquire about the limitations period on filing a complaint of sexual harassment based on Mr. Kelly's January 2007 "pole dancing" comment.  (Pl.'s Ex. 2.)  Ms. Jordan stated that she felt Mr. Kelly had unfairly removed her from service, and that she wanted to file a complaint against him based on his January 2007 "pole dancing" remark.  (Id.)  The record indicates that no formal complaint was made at that time.

**The July 15, 2008 Request for an Evaluation**

▸  On July 15, 2008, Mr. Kelly wrote to SEPTA's Medical Director and requested that Ms. Jordan undergo an Evaluation for Fitness for Duty.  (Pl.'s Ex. 5.)  Mr. Kelly explained that Ms. Jordan had been exhibiting "unusual behavior" and that "[s]he has filed harassment complaints about several of her co-workers . . . and has even disparaged the character of the managers."  (Id.)  He stated that "she may no longer have the temperament to work with the public and interact with her co-workers" and requested an evaluation "to determine her fitness for continuing employment as a bus operator."  (Id.)

**The September 12, 2008 Incident and Resulting October 21, 2008 Suspension**

▸  On September 12, 2008, Ms. Jordan was involved in a confrontation with another SEPTA Bus Operator, Kimberly Healy.  Ms. Jordan had been told that Ms. Healy was involved in an inappropriate relationship with a superior, Fred Melhuish, the Assistant Director at SEPTA's Southern District.  (Defs.' Facts ¶¶ 11-13; Pl.'s Resp. ¶¶ 11-13.)  In an effort to "get something on [Mr. Melhuish]" Ms. Jordan had previously taken a photo of him sitting on the bumper of Ms. Healy's car outside of the Southern District Bus Depot.  (Defs.' Facts ¶¶ 12-13; Pl.'s Resp. ¶¶ 12-13; Jordan Dep. 96:8-13, 102:4-13.)  Ms. Jordan testified that on September 12, 2008, Ms. Healy approached her while she was sitting in a

3

bus shelter outside of the Southern District talking on her cell phone. (Jordan Dep. 129:12-15, 133:9.) Ms. Jordan testified that Ms. Healy stated, "I see you have your cell phone. I hope you're not taking my f—ing picture." (Id. at 135:11-13.) Ms. Jordan responded, "I wasn't taking your damn picture, get the hell out of my face." (Id. at 136:2-4.) According to Ms. Jordan, Ms. Healy ended the encounter by saying, "F— you. Bitch." (Id. at 137:2-6.)

▸    Ms. Jordan then went inside the Bus Depot and called SEPTA's Control Center. (Defs.' Facts ¶ 18; Pl.'s Resp. ¶ 18.) While on hold, on a recorded line, Ms. Jordan engaged in a conversation with a coworker during which she made the following comments about Ms. Healy and Mr. Melhuish, that were recorded by SEPTA's Control Center:

>    "She ain't nothing but a f—in' whore;"

>    "FoleydotFred. Foley was about to leave his wife . . . I'm gonna come up with a name for her, FoleyFreddot;"

>    "Rumors around here swirling that they got something going on;"

>    "This man, has been harassing me, he has been harassing me. [I was advised] You watch how he interacts with this female. And I did. Rumors had it that I had taken a picture of them about three or four months ago;"

>    "The Assistant Superintendent is probably behind this, tellin' her to do this, because of the simple facts that he's been trying to fire me ever since I came back to driving two years ago;" and

>    "My union rep told me, he said, 'You know what, he is trying to take your job and what I need you to do is, I need you to continue to observe her behavior, and his behavior.' And I did that. OK, OK, I was outside one day and I was taking these pictures, I saw him and her together acting inappropriately, but today I did not take a picture of her." (Defs.' Facts ¶ 19; Pl.'s Resp. ¶ 19.)

▸    SEPTA investigated this incident with Mr. Kelly acting on behalf of the Authority. (Defs.' Ex. 11.) Mr. Kelly charged Ms. Jordan with violating SEPTA's Sexual

Harassment Policy,[2] Authority Standard Rule ("ASR") 7, governing personal conduct,[3] and ASR-9-B, governing cell phones and other electronic devices.[4]  (Defs.' Ex. 11.) Following an informal hearing on October 14, 2008, Mr. Kelly proposed a three-day suspension, which was not accepted by Ms. Jordan.  (Defs.' Ex. 11.)  A formal hearing was held on October 21, 2008, with hearing officer David Rodgers presiding, during which Ms. Jordan was accompanied by her union representatives.  (Defs.' Ex. 10.)  Mr. Rodgers upheld the three-day suspension (see id.), of which Ms. Jordan served one day (Jordan Dep. 187:6-8).

**Ms. Jordan's October 6, 2008 Complaint**

▸      On October 6, 2008, twenty-one (21) months after the incident occurred, and on a day Ms. Jordan was barred from work following the incident with Ms. Healy, Ms. Jordan filed a complaint with SEPTA's EEO/AA Office regarding Mr. Kelly's January 2007 "pole dancing" remark.  (Defs.' Ex. 6.)  In the complaint, she stated that the reason for her delay in filing the complaint was that she "felt Mr. Kelly would treat [her] fairly" going forward, but she "found it to be a bad decision" because Mr. Kelly had recently

---

[2] SEPTA's Sexual Harassment Policy provides that sexual harassment "refers to behavior that is unwelcome, offensive, demeaning or intimidating to the person subjected to such behavior."  It lists the following as "examples of behaviors that may serve to create a hostile or abusive environment": "Profanity, especially words with sexual connotations;" "lewd or profane jokes or gestures;" "spreading rumors about a person's sex life or perceived sex life;" and "personal commentaries which have been discouraged by the recipient."  (Defs.' Ex. 13.)

[3] ASR-7 Personal Conduct provides: "Employees are expected at all times to conduct themselves in a manner which does not jeopardize or otherwise disgrace the public image of the Authority. Any actions which are deemed to be insubordinate, uncivil, immoral, indecent, socially disapproved, or otherwise abusive to other employees, passengers or the general public will be considered as conduct unbecoming of an Authority employee, and may subject the offending employee to disciplinary action up to and including discharge and other civil penalties depending upon the severity of the offense."  (Defs.' Ex. 12.)

[4] ASR-9-B Cell Phones and Other Electronic Devices Provides: "Using a cellular telephone or personal pager, unless such a device has been provided for the operation or has been provided for the operation or has been specifically authorized for use by the Authority is prohibited. The use and/or display of headphones, earpieces, microphones or other such peripheral devices commonly associated with the use of electronic devises is prohibited unless such a device has been provided for the operation or has been specifically authorized for use by the Authority.  Having or using a portable computer, portable transmitting radio, television set, radio or other similar stereo device or other unauthorized electronic device, unless such device has been specially provided for the operation or has been specifically authorized for use by the Authority, is prohibited."  (Defs.' Ex. 12.)

suspended her in connection with the confrontation with Ms. Healy.  (Id.)  In the complaint, she stated, "[s]ince I'm suspended for saying something about an individual behind their back, then he should be for saying something derogatory to me in my face." (Id.)

▸　The complaint was investigated by SEPTA employee Carol O'Neal.  (Defs.' Ex. 7.)  Ms. O'Neal noted that Mr. Kelly did not deny making the comment, but determined that because Mr. Kelly apologized and underwent management training on Harassment Prevention, no further action would be taken.  (Id.)

▸　Also on October 6, 2008, Ms. Jordan filed a complaint with the PHRC alleging race discrimination.  (Defs.' Ex. 14.)  The complaint stated that Ms. Jordan was suspended for "intimidat[ing]" Ms. Healy, a Caucasian, who engaged in similar conduct but was not disciplined.  (Id.)

**Ms. Jordan's November 10, 2008 Amendment to her October 6, 2008 Complaint**

▸　On November 10, 2008, Ms. Jordan amended her PHRC complaint to add a charge of sex-based discrimination.  (Defs.' Ex. 15.)  She alleged that Mr. Comber, the SEPTA Manager of Employee Relations who had investigated her 2007 complaint against Ms. Carpenter, told Ms. Jordan that she "should not submit so many complaints."  (Id.)  The amendment further alleged that male or Caucasian employees were not discouraged from filing complaints.  (Id.)

**The August 4, 2009 Suspension**

▸　On July 1, 2009, a SEPTA Service Quality Agent reported that he observed Ms. Jordan operating a bus while looking at a cell phone, in violation of ASR-9-B.  (Defs.' Ex. 16.)  SEPTA Transportation Manager Darryle Crawley subsequently stopped Ms. Jordan's bus to verify the agent's report, and did not observe a cell phone.  (Defs.' Facts ¶ 36; Pl.'s Resp. ¶ 36.)  Ms. Jordan denies that she was using a cell phone.  She testified that she had a voice pedometer, not a cell phone, clipped to her belt.  (Jordan Dep. 202:12-18.)  SEPTA took the position that possession of the voice pedometer also violated ASR-9-B. (Defs.' Ex. 17.)

▸　On July 23, 2009, another Service Quality Agent reported observing Ms. Jordan wearing pink earbuds in her ears while operating a bus in violation of ASR-9-B.  (Defs.' Ex. 18.) Ms. Jordan conceded wearing the earbuds to cut down on noise.  (Jordan Dep. 201:15-19, 222:11-13.)

▸　On August 4, 2009, a hearing was conducted regarding Ms. Jordan's alleged July 1, 2009 rule violation for using an electronic device while operating a bus.  (Defs.' Facts ¶ 41; Pl.'s Resp. ¶ 41.)  At this time, Ms. Jordan had already received a three day suspension on

October 21, 2008 resulting from the comments she made about Ms. Healy on a recorded SEPTA telephone line.  Pursuant to the Agreement between SEPTA and Ms. Jordan's union, the next step in the agreed upon "Progressive Discipline" system was discharge. (Defs.' Ex. 3.)

▸ Joseph Carson, the Director of Transportation, presided over the hearing and initially recommended discharge.  (Defs.' Facts ¶ 44; Defs.' Ex. 17; Pls.' Ex. 15.)[5]  Ms. Jordan's Union requested that, rather than termination, Ms. Jordan repeat the three day suspension.  (Defs.' Facts ¶ 45; Defs.' Ex. 17; Pl.'s Ex. 15.)  Mr. Carson modified his initial recommendation accordingly, reducing Ms. Jordan's proposed discipline from discharge to a three day suspension.  (Defs.' Facts ¶ 46; Defs.' Ex. 17; Pl.'s Ex. 15.)  The Union also requested that the date of Ms. Jordan's discipline be made retroactive to July 15, 2009, which would benefit Ms. Jordan because the progressive discipline system started anew when an employee completed 730 calendar days without being disciplined.  (Defs.' Facts ¶ 47; Defs.' Ex. 17; Pl.'s Ex. 15.)  The Union further requested that Ms. Jordan's July 23, 2009 violation of ASR-9-B – for wearing earbuds while operating a bus – be added to her discipline without further action against her.  (Defs.' Facts ¶ 49; Defs.' Ex. 17; Pl.'s Ex. 15.)  Mr. Carson agreed to both requests.  (Defs.' Facts ¶¶ 48, 50; Defs.' Ex. 17; Pl.'s Ex. 15.)  Thus, a three day suspension was proposed, and on the Charge Sheet, beside "resolution accepted," Ms. Jordan circled "yes"and signed the bottom of the sheet.  (Defs.' Ex. 19.)  Ms. Jordan served one day of the suspension, on August 10, 2009. (Defs.' Facts ¶ 53; Pl.'s Resp. ¶ 53.)

**Ms. Jordan's August 13, 2009 Complaint**

▸ On August 13, 2009, Ms. Jordan filed another PHRC complaint.  (Defs.' Ex. 20.)  In it, she alleged that SEPTA retaliated against her for filing her October 6, 2008 PHRA

---

[5] In her Response to the Defendants' Statement of Undisputed Facts, the Plaintiff summarily denies all allegations related to the August 4, 2009 hearing on the grounds that "[a]ny conduct related to a Union Grievance proceeding has absolutely no relevance to Plaintiff's claims of retaliation and violation of Title VII and the PHRA or Section 1981 against Mr. Kelly and involves a proceeding this Honorable Court has already ruled is out of his subject matter jurisdiction."  (Pl.'s Resp. ¶¶ 45-51.)  Plaintiff misconstrues the court's prior decision.  The court, in its February 4, 2011 decision (Doc. 10), dismissed Plaintiff's wrongful termination claim because the tort can only accrue to at-will employees, and Plaintiff was not an at-will employee.  Nothing in that decision renders the various grievance proceedings, which are critical facts surrounding Ms. Jordan's discipline and ultimate termination, irrelevant.  Moreover, Federal Rule of Civil Procedure 56(c) requires Plaintiff to cite to the record when asserting that a fact is genuinely in dispute.  Fed. R. Civ. P. 56(c).  Because Plaintiff failed to do so with respect to Defendants paragraphs 45-51, and because the Defendants cited credible evidence in the record supporting these facts, the court will consider the facts undisputed for the purposes of the present motion.  See Fed. R. Civ. P. 56(e)(2).

complaint – amended on November 10, 2008 – by issuing her the recent three day suspension.  (Id.)  She further alleged that SEPTA was subjecting her to undue scrutiny by constantly observing her and routinely assigning her buses equipt with cameras.  (Id.)

**Ms. Jordan's October 23, 3009 Injury**

▸     On October 23, 2009, Ms. Jordan was injured when a bus she was operating hit a pothole.  (Defs.' Facts ¶ 56; Pl.'s Resp. ¶ 56; Jordan Dep. 226:4-13.)  Ms. Jordan reported the incident to Mr. Carson and was examined by a SEPTA panel physician on October 26, 2009.  (Defs.' Facts ¶¶ 59, 61; Pl.'s Resp. ¶¶ 59, 61.)  The physician initially put her on light duty, but released her to full duty status on October 30, 2009.  (Defs.' Facts ¶¶ 61-62; Pl.'s Resp. ¶¶ 61-62.)  Ms. Jordan filed a Workers' Compensation claim for this injury, which was denied.[6]  (Pl.'s Concise Statement of Disputed Facts in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Facts") ¶ 21; Pl.'s Ex. 16.)

**The Denial of Sick Benefits and Ms. Jordan's Termination**

▸     On December 2, 2009, Ms. Jordan began experiencing pain while operating a bus.  She notified SEPTA's Control Center and was taken to the emergency room by ambulance.  (Defs.' Facts ¶¶ 63-64; Pl.'s Resp. ¶¶ 63-64.)   She was released from the hospital and returned to the Southern District early in the morning on December 3, 2009.  (Defs.' Facts ¶ 65; Pl.'s Resp. ¶ 65.)

▸     Later that day, Ms. Jordan prepared an Operator's Accident Report in which she stated that the pain from the injuries that she suffered on October 23, 2009 never subsided, due to lack of treatment by the panel physician.  (Defs.' Ex. 26.)  She stated that when the pain became unbearable, she called the Control Center to seek medical attention.  (Id.)  Ms. Jordan also partially filed out an Employee Injury Report in which she indicated that "the pain never subsided, so I guess this is classified as a recurrence."  (Defs.' Ex. 27.)  Ms. Jordan called out sick on December 3, 2009 and was placed in SEPTA's "sick book."  (Pl.'s Ex. 19.)

▸     Because Ms. Jordan characterized her pain as having been caused by an injury sustained while on duty, SEPTA took the position that she needed to be cleared by a SEPTA panel physician.  (Defs.' Ex. 29 at 38.)

▸     The facts are disputed regarding whether, and when, Ms. Jordan was instructed to report to SEPTA's medical office to schedule an appointment with a panel physician.  SEPTA claims that Mr. Carson instructed her to report on December 4, 2009, and, when she failed to do so due to a scheduling conflict, he directed her to report on December 7,

---

[6] The denial of Ms. Jordan's claim was later reversed by a Pennsylvania Workers' Compensation Judge.  (Pl.'s Ex. 34.)

2009.  (Defs.' Facts ¶ 69.)  Ms. Jordan claims that she was unaware that she was required to see a panel physician until she received a letter from Mr. Carson on December 9, 2009.  (Jordan Dep. 257:18-261:22; 294:10-23.)  In that letter, Mr. Carson cited Ms. Jordan's failure to report as instructed on December 4 and 7, and directed her to report to him on December 14, 2009, to schedule a panel doctor visit.  (Defs.' Ex. 30.)  He further stated, "[f]ailure to comply with this directive will result in your being dropped from the rolls of the Authority."  (Id.)

▸    On December 10, 2009, Ms. Jordan prepared and submitted a Sick Benefit Application Form to SEPTA's Human Resources Department.  (Defs.' Ex. 31.)  Her treating physician also signed the form.  (Id.)  However, in the portion of the form "to be completed by employee's location," there was a notation stating, "location refused to complete & submit 12-14-09 @ approx 1:35 pm."  (Id.)  SEPTA's Benefits Manager testified that Ms. Jordan's "boss at the time," whom the clerk could not identify, called "saying he wasn't going to fill it out." (Jeanette Gerena Dep. 22:4-10, Apr. 6, 2011.)

▸    Ms. Jordan did not report to the Southern District on December 14, 2009 as directed.  Ms. Jordan's position was that she was not required to see a SEPTA panel physician because she had done so when the injury occurred in October 2009, had been cleared for work, and had her Workers' Compensation claim for the injury denied.  Thus, Ms. Jordan sought sick benefits, which entitled her to see her own physician, rather than Injured on Duty ("IOD") status, which would require her to visit a SEPTA panel physician.  (Pl.'s Resp. ¶¶ 68, 70.)

▸    On December 15, 2009, in a letter to Ms. Jordan, Mr. Carson cited the three missed dates during which Ms. Jordan was to schedule an appointment with a panel physician and instructed Ms. Jordan to "return all Authority property . . . as soon as possible."  (Defs.' Ex. 33.)  SEPTA's position was that, by failing to follow Mr. Carson's directives, Ms. Jordan was in violation of ASR-9-A-16,[7] which warranted her termination.  (Defs.' Ex. 34.)

▸    On January 17, 2010, Ms. Jordan received a letter from Mr. Carson informing her that she had been reinstated in order for the matter to be handled through the progressive discipline process.  (Pl.'s Ex. 28.)  A formal hearing was held on February 16, 2010 and it was determined that discharge was warranted.  (Defs.' Ex. 34.)  A Labor Relations Step hearing, the final step in the grievance process, was held on April 1, 2010 and resulted in Ms. Jordan's discharge being upheld.  (Defs.' Ex. 35.)

---

[7] ASR-9 Prohibited Behavior/Activities provides: "The following behaviors and/or activities are prohibited by all employees of the Authroity.  Each action is subject to disciplinary action, up to and including discharge . . . . (16) Committing any act of insubordination toward the proper authority, including but not limited to: . . . (b) disobedience of rules or directive."  (Defs.' Ex. 12.)

## II.       STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Levy v. Sterling Holding Co., 544 F.3d 493, 501 (3d Cir. 2008). Only a factual dispute that is both genuine and material will defeat a motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). A factual dispute is "genuine" if the evidence is such that a reasonable jury could possibly return a verdict for the non-movant.  Id. at 248.  A dispute is "material" if it would affect the outcome of the case under governing substantive law.  Id.

The moving party bears the initial burden to demonstrate that there are no facts on record that support the non-moving party's position.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the moving party carries this burden, the non-moving party must then present specific facts showing the existence of a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Id. at 586.  The non-moving party cannot rest upon the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

At the summary judgment stage, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-movant.  See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Communications, Inc., 258 F.3d 132, 140 (3d Cir. 2001).

"This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial questions." Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997) (quoting Robinson v. PPG Indus. Inc., 23 F.3d 1159, 1162 (7th Cir. 1994)).

## III.     DISCUSSION

### A.     Plaintiff's Race and Gender Discrimination Claims Under Title VII and the PHRA (Counts 1 & 5)

Ms. Jordan alleges that because of her race, African American, and gender, female, both Defendants discriminated against her in violation of Title VII and the PHRA. The analysis under both statutes is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably. See Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001). Claims of discrimination are subject to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973) ("McDonnell Douglas"). Under McDonnell Douglas, the plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. To establish a *prima facie* case, the plaintiff must prove that (1) she is a member of a protected minority; (2) she was qualified for the position in question; (3) despite her qualifications, she suffered an adverse employment action; and (4) the circumstances give rise to an inference of unlawful discrimination. See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999).

If the plaintiff meets its burden of stating a *prima facie* case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. McDonnell Douglas Corp., 411 U.S. at 802. "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the

11

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Jones, 198 F.3d at 410.

Defendants concede, for the purposes of summary judgment, that Ms. Jordan is a member of a protected class and that she was qualified for her position as a bus operator.  (Defs.' Mem. in Supp. of Mot. Summ. J. 12, 23.)  Defendants further concede that Ms. Jordan experienced three adverse employment actions:

(1)     the three-day suspension issued on October 21, 2008 relating to the confrontation with Ms. Healy;

(2)     the three-day suspension issued on August 4, 2009 relating to the use of an unauthorized electronic device and wearing ear buds while operating a bus; and

(3)     her initial termination on December 15, 2009 and final termination on February 16, 2010.  (Id. at 12-13, 23-24.)

Defendants argue that Ms. Jordan has not shown that she was suspended or terminated under circumstances that give rise to an inference of discrimination.  Thus, only the fourth prong of the McDonnell Douglas test is at issue.

In order to satisfy this fourth prong, a plaintiff must establish some "causal nexus" between her membership in a protected class and the adverse employment action.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003).  The Third Circuit has recognized several ways to show such a causal nexus.  A plaintiff may present evidence that "those exhibiting discriminatory animus influenced or participated in the [adverse employment decision]."  Clair v. Agusta Aerospace Corp., 592 F. Supp. 2d 812, 819 (E.D. Pa. 2009) (quoting Abramson v. William Paterson Coll. of N. J., 260 F.3d 265, 285-86 (3d Cir. 2001)).  A plaintiff may alternatively present evidence that "similarly situated individuals were treated more favorably."  Campetti v.

12

Career Educ. Corp., 2003 WL 21961438, at *8 (E.D. Pa. June 25, 2003).  "Similarly situated employees are ones who have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. at *9 (internal quotations and citations omitted).

      1.    October 21, 2008 Suspension

In order to meet prong four of her *prima facie* case with regards to the three-day suspension issued on October 21, 2008 relating to the confrontation with Ms. Healy, Ms. Jordan argues that Ms. Healy and Mr. Kelly were similarly situated Caucasians, and Mr. Kelly was a similarly situated male, who were treated more favorably.  Even assuming, *arguendo*, that the fourth element of Ms. Jordan's *prima facie* case has been met, her discrimination claims based on her October 21, 2008 suspension would still fail to survive summary judgment.  The Defendants have provided legitimate, non-discriminatory reasons for suspending Ms. Jordan, namely, Ms. Jordan's comments concerning Ms. Healy, made on a recorded line, in violation of several SEPTA policies.  Thus, the burden shifts back to Ms. Jordan to offer evidence that the legitimate, non-discriminatory reasons articulated by Defendants were a pretext for discrimination.  She may meet this burden by providing evidence that would allow a fact finder to reasonably "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Jones, 198 F.3d at 413 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  Ms. Jordan may support an assertion that an invidious discriminatory reason was more likely than not a motivating cause by showing "the employer has treated more favorably

similarly situated persons not within the protected class."  Id. (quoting Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998)).

With respect to the October 21, 2008 suspension, Ms. Jordan does not, and cannot, dispute that she made the comments recorded on the SEPTA's Control Center line.  Thus, Ms. Jordan offers only the disparate treatment between herself and Ms. Healy as evidence that Defendant Kelly's proffered legitimate reasons were pretextual.  She offers this evidence, plus the disparate treatment between herself and Mr. Kelly as evidence that Defendant SEPTA's proffered legitimate reasons were pretextual.  Ms. Jordan cites two cases, Windsor v. Bethesda General Hospital, 523 F.2d 891 (8th Cir. 1975) and Albert v. Carovano, 824 F.2d 1333 (2nd Cir. 1987), which stand for the proposition that unequal application of disciplinary policies may constitute discrimination.  However, these cases are unhelpful because they deal with whether the allegations in a plaintiff's complaint have met the relatively light pleading standard, rather than whether the facts adduced during discovery are sufficient to satisfy a plaintiff's "difficult burden" of proffering evidence showing that an employer's legitimate, non-discriminatory reasons for an adverse employment action were a pretext for discrimination.  See Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (quoting Fuentes, 32 F.3d at 765).

Ms. Jordan has not met this burden, because neither Ms. Healy nor Mr. Kelly is a similarly situated comparator.  The SEPTA Control Center's recording conclusively established that Ms. Jordan made a series of harassing and offensive comments about Ms. Healy to a colleague – including calling Ms. Healy a "f—ing whore" and suggesting that she was sexually involved with a supervisor.  Further, Ms. Jordan admitted taking unauthorized photographs in an attempt to "get something" on Ms. Healy and Mr. Melhuish.  Her conduct violated three separate

14

SEPTA policies, including SEPTA's sexual harassment policy and its policy prohibiting the use of unauthorized electronic devices.

Ms. Healy, on the other hand, is alleged to have said, "f— you, bitch" to Ms. Jordan.  Ms. Jordan offers no evidence aside from her own testimony to support this allegation, and the reports from Ms. Healy and Mr. Melhuish to SEPTA make no mention of the remark.  (Pl.'s Ex. 6 at SEPTA/JORDAN 00375; Pl.'s Ex. 8.)   Thus, far from the conclusive evidence against Ms. Jordan, the only evidence SEPTA had against Ms. Healy was Ms. Jordan's complaint.  But even assuming SEPTA had conclusive evidence that Ms. Healy made the remark, it does not render Ms. Healy a similarly situated comparator.  Ms. Healy was not "spreading rumors about a person's sex life or perceived sex life" to other employees, nor was Ms. Healy using an unauthorized electronic device to photograph and harass another employee, as was Ms. Jordan.

Similarly, Mr. Kelly's isolated remark is incomparable to Ms. Jordan's behavior. Moreover, SEPTA investigated Ms. Jordan's complaint – made almost two years after Mr. Kelly's comment and during her suspension over the incident with Ms. Healy – and concluded that because Mr. Kelly apologized and subsequently attended management training on harassment prevention, discipline would be unwarranted.  Thus, Ms. Healy and Mr. Kelly are not sufficiently similar comparators so as to allow Ms. Jordan to point to Defendants' failure to discipline them as evidence that Defendants' legitimate reasons were a pretext for discrimination.

### 2.    The August 4, 2009 Suspension

In order to meet prong four of her *prima facie* case with regards to the three-day suspension issued on August 4, 2009 for using an unauthorized electronic device and wearing ear buds while operating a bus, Ms. Jordan argues that other SEPTA employees regularly violated

the policy but were not disciplined.  However, Ms. Jordan provides no evidence to support her assertion.  Because Ms. Jordan cannot identify a similarly situated person who was treated more favorably, and proffers no other evidence of a causal nexus, she has failed to establish a *prima facie* case of discrimination based on her August 4, 2009 suspension.  See Tyler v. Se. Pa. Transp. Auth., 2002 WL 31965896, at *3 (E.D. Pa. Nov. 8, 2002) (holding plaintiff failed to establish fourth prong of *prima facie* case where he failed support his allegations with evidence of a similarly situated person who was treated more favorably).

Again, even if Ms. Jordan could satisfy her *prima facie* case, the Defendants have articulated a legitimate, non-discriminatory reason for their action: Ms. Jordan was admittedly carrying a voice pedometer and using earbuds in violation of SEPTA's policy prohibiting the use of unauthorized electronic devices.  Ms. Jordan fails to demonstrate that these reasons were pretext because she offers no evidence suggesting that Mr. Carson, who imposed the suspension, was motivated by discriminatory animus.  To the contrary, the record shows that Mr. Carson agreed to all of the Union's requests on Ms. Jordan's behalf for lessor disciplinary measures. Moreover, Ms. Jordan proffers no evidence of similarly situated employees from whom to draw a comparison.  Therefore, her discrimination claim based on her August 4, 2009 suspension cannot survive summary judgment.

### 3.   Termination

Finally, with respect to her termination, Ms. Jordan argues that Defendants' failure to honor her request to be placed on SEPTA's sick book following her December 2, 2009 injury, rather than being classified as IOD and required to consult a SEPTA panel physician, is sufficient evidence to satisfy the forth prong of her *prima facie* case.  However, even after the court

requested supplemental briefing on this specific issue, Ms. Jordan has failed to show a causal

nexus between SEPTA's decision and her race or gender.  She has been unable to identify any

evidence of a similarly situated employee being treated more favorably, and no evidence that

anyone involved in the decision exhibited "discriminatory animus" toward her based on her race

or gender.[8]

Thus, Ms. Jordan's discrimination claims against Defendants under Title VII and the

PHRA must be dismissed.

### B.   Plaintiff's Retaliation Claims Under Title VII and the PHRA (Counts 3 & 6)

Retaliation claims asserted under the PHRA are construed coextensively with Title VII's

anti-retaliation provisions.  See Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).

Thus, the elements of Ms. Jordan's *prima facie* case for retaliation under Title VII and the PHRA

are the same, and both claims will be considered together.  To establish a *prima facie* case of

retaliation, Ms. Jordan must show 1) that she engaged in a protected activity; 2) the employer

took an adverse employment action against her; and 3) a causal connection between her protected

activity and the employer's adverse employment action.  See id.  Once Plaintiff establishes a

*prima facie* case, her retaliation claims involve the same McDonnell Douglas burden-shifting

framework that applied to her discrimination claims.  See id.

---

[8] Ms. Jordan has offered no evidence of discriminatory animus related to her race, and the
only piece of evidence she has offered that is relevant to her gender is the isolated comment by
Mr. Kelly made in January 2007 in which he referred to Ms. Jordan as a "pole danc[er]."  This
remark alone is insufficient to sustain Plaintiff's burden.  See Garcia v. Mariana Bracetti Acad.
Charter Sch., 2012 WL 706555, at *6 (E.D. Pa. Mar. 6, 2012) ("Stray remarks by non-
decisionmakers or by decisionmakers unrelated to the decision process are rarely given great
weight, particularly if they were made temporally remote from the date of the decision.")
(quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)).

1.    <u>Protected Activity</u>

To satisfy the first prong of her *prima facie* case, Ms. Jordan must show that she engaged in a protected activity.  Defendants concede, for purposes of summary judgment, that Ms. Jordan engaged in the following protected conduct:

(1)    complaining to Mr. Kelly about his inappropriate comment in January 2007;

(2)    calling SEPTA's EEO/AA Office on December 3, 2007 to complain about Mr. Kelly's inappropriate comment;

(3)    filing an internal complaint with SEPTA's EEO/AA Office on October 6, 2008;

(4)    filing a complaint with the PHRC alleging race discrimination on October 6, 2008;

(5)    amending her PHRC complaint on November 10, 2008 to add gender discrimination; and

(6)    filing a second complaint with the PHRC alleging retaliation on August 13, 2009.

(Defs.' Reply 8-9.)  Thus, Ms. Jordan has satisfied the first prong of her *prima facie* case.

However, Defendants disagree with Ms. Jordan's characterization of her September 27, 2007 complaint with SEPTA's EEO/AA Office and her September 12, 2008 incident report against Ms. Healy, as protected activities.  Protected activities include complaints of discrimination in violation of federal law.  <u>See</u> <u>Atkinson v. Lafayette Coll.</u>, 653 F. Supp. 2d 581, 595 (E.D. Pa. 2009); <u>Russ-Tobias v. Pa. Bd. of Prob. and Parole</u>, 2006 WL 516771, at *23 E.D. Pa. Mar. 2, 2006) ("Protesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct.") (quoting <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1085 (3d Cir. 1996)).  While a complaint via an employer's grievance framework would constitute a protected activity, the complaint must "at a minimum convey the speaker's express

18

or implicit protest of discriminatory practices that violate the federal anti-discrimination statutes." Atkinson, 653 F. Supp. 2d at 595-96 (quotation and citation omitted).  In other words, "[a] general complaint of unfair treatment is insufficient to establish protected activity."  Id. at 596 (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)).

A review of Ms. Jordan's September 27, 2007 complaint with SEPTA's EEO/AA office reveals a grievance regarding another SEPTA employee, Ms. Carpenter, assigning newer busses in better positions on the lot to operators that Ms. Carpenter liked, including an operator Ms. Carpenter was allegedly dating.  (See Defs.' Ex. 4.)  Contrary to Ms. Jordan's characterization of the complaint as one of gender discrimination, the complaint itself contains no allegation of discrimination on the basis of gender.  In fact, her complaint lists other bus operators, including three male operators, whom Ms. Jordan claims suffered similar treatment by Ms. Carpenter.  (Id.) Likewise, Ms. Jordan's September 12, 2008 incident report against Ms. Healy, even read in the light most favorable to Ms. Jordan, does not allege race or gender discrimination.  (See Pl.'s Ex. 6.)  Rather, the report describes an incident in which Ms. Healy referred to Ms. Jordan using profanity, after mistakenly believing that Ms. Jordan was trying to take her picture – as Ms. Jordan had admittedly done in the past.  (Id.)  Thus, neither complaint alleged illegal discrimination and neither constitutes a protected activity for purposes of Ms. Jordan's *prima facie* retaliation case.

Because Ms. Jordan has satisfied the first prong of her *prima facie* case by engaging in the six protected activities listed above, the court will proceed to the second element of the *prima facie* case, adverse employment action.

2.      Adverse Employment Action

To satisfy the second prong of her *prima facie* case, Ms. Jordan must show that she suffered an adverse employment action.  Defendants concede that Ms. Jordan experienced three adverse employment actions:

(1)      the three-day suspension issued on October 21, 2008;

(2)      the three-day suspension issued on August 4, 2009; and

(3)      her initial termination on December 15, 2009 and final termination on February 16, 2010.

(Defs.' Reply 9.)  Defendants dispute, however, that Ms. Jordan's temporary removal from service on December 3, 2007, the request that she undergo an "Evaluation for Fitness for Duty" on July 15, 2008, and the denial of sick benefits from December 3, 2009 to February 19, 2010, may properly constitute adverse employment actions for purposes of her *prima facie* case.

To show an adverse employment action in the context of a claim for retaliation, a plaintiff must show that a "reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 164 L. Ed. 2d 345 (2006)).  The Supreme Court has emphasized that "the adverse action must be material because, 'it is important to separate significant from trivial harms.'"  Baur v. Crum, 2012 WL 1071143, at *12 (E.D. Pa. Mar. 30, 2012) (quoting Burlington, 548 U.S. at 68). However, the Court has also emphasized that, when evaluating whether an employer's action is "materially adverse," the context of the situation matters.  Burlington, 548 U.S. at 69.

Ms. Jordan's temporary removal from service on December 3, 2007, and the request that she undergo an evaluation on July 15, 2008, may not, under other circumstances, rise to the level of a "materially adverse" retaliatory action.  However, the surrounding circumstances are such that a reasonable jury may find that these actions were materially adverse.  Specifically, the supervisor responsible for both actions, Mr. Kelly, was the object of Ms. Jordan's complaints.  (See Pl.'s Ex. B at 47:13-15.)  After removing Ms. Jordan from service on December 3, 2007, he wrote to SEPTA's Medical Director, Dr. Richard Press, inquiring about Ms. Jordan's clearance for work, and noted "[s]he has called every office we have to file her harassment complaint."  (Pl.'s Ex. 3.)  Similarly, in his request for an evaluation of Ms. Jordan made in July 2008, Mr. Kelly stated that one of his reasons for questioning Ms. Jordan's fitness for duty was that "[s]he has filed harassment complaints about several of her co-workers . . . and has even disparaged the character of the managers."  (Pl.'s Ex. 5.)  Thus, although temporarily removing an employee from service or requesting a psychological evaluation may not always constitute a "materially adverse" employment action, under the circumstances here, a reasonable jury could conclude that the request was indeed an act of retaliation.  See Baur, 2012 WL 1071143, at *13 (finding instruction that plaintiff obtain a psychological evaluation constituted adverse employment action).

Similarly, the denial of sick benefits may properly constitute an adverse employment action.  Defendants do not argue that the denial of sick benefits is not a "materially adverse" employment action, nor could they.  Instead, Defendants appear to argue that, because Ms. Jordan's FMLA claims were dismissed, the denial of sick benefits is no longer at issue.  (See Defs.' Reply n.13.)  The decision dismissing Ms. Jordan's FMLA claims turned on Ms. Jordan's

21

ineligibility under the Act:  Ms. Jordan had not worked the requisite 1,250 hours in the 12 months preceding her application for FMLA leave, and therefore was not eligible under the Act. (See Mem. 6, Mar. 19, 2012.)  Sick benefits available under the terms of Ms. Jordan's employment with SEPTA, however, were distinct from FMLA leave.  (See Pl.'s Ex. 30.) SEPTA's Sick Benefits Application form specifically states that "approval for Sick Benefits does not guarantee approval for FMLA leave."  (Pl.'s Ex. 23.)  Thus, Ms. Jordan's ineligibility for FMLA leave, as determined in a prior decision of this court, is distinct from her eligibility for Sick Benefits per the terms of her employment with SEPTA, and nothing in the prior opinion addressed the latter issue.  Therefore, the denial of sick benefits remains at issue, and may form the basis of Ms. Jordan's *prima facie* case for retaliation under Title VII and the PHRA.

      3.    Causal Connection

In the third step of her *prima facie* case of retaliation, Ms. Jordan must establish a causal connection between her protected conduct, and the adverse employment actions.  Specifically, Ms. Jordan must show a causal connection between the following protected conduct:

    1)    complaining to Mr. Kelly about his inappropriate comment in January 2007;

    2)    calling SEPTA's EEO/AA Office on December 3, 2007 to complain about Mr. Kelly's inappropriate comment;

    3)    filing an internal complaint with SEPTA's EEO/AA Office on October 6, 2008;

    4)    filing a complaint with the PHRC alleging race discrimination on October 6, 2008;

    5)    amending her PHRC complaint on November 10, 2008 to add gender discrimination; and

    6)    filing a second complaint with the PHRC alleging retaliation on August 13, 2009.

and the adverse employment actions:

1)      the temporary removal from service on December 3, 2007;

2)      the request that Ms. Jordan undergo an "Evaluation for Fitness for Duty" on July 15, 2008;

3)      the three-day suspension issued on October 21, 2008;

4)      the three-day suspension issued on August 4, 2009;

5)      the denial of sick benefits requested on December 10, 2009; and

6)      her initial termination on December 15, 2009 and final termination on February 16, 2010.

The Third Circuit has recognized that "a plaintiff may rely on a broad array of evidence to demonstrate a causal link between [her] protected activity and the adverse action taken against [her]."  Marra, 497 F.3d at 302 (quotation and citation omitted).  "In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection."  Id. (quotation and citations omitted).  However, "the mere passage of time is not legally conclusive proof against retaliation."  Id.  (quoting Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 894 (3d Cir. 1993)).  When proximity in time does not itself suffice to establish causation, "courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole."  Id. (quotation and citations omitted).

23

With this in mind, the court will analyze each of the adverse employment actions to determine whether there is a causal connection between it and the protected activities.

With respect to her removal from service in December 2007 and the request for an evaluation in July 2008, the court agrees with Plaintiff that Mr. Kelly's statements connecting his actions with Ms. Jordan's complaints of harassment is enough of a causal connection to survive summary judgment.  (See Pl.'s Ex. 3 (in connection with the December 2007 removal from service, "[s]he has called every office we have to file her harassment complaint"); Pl.'s Ex. 5 (in connection with the July 2008 request for an evaluation, "[s]he has filed harassment complaints about several of her co-workers . . . and has even disparaged the character of the managers").) Further, Mr. Kelly's specific statements referencing Ms. Jordan's harassment complaints in connection with his adverse employment decisions in these two instances is enough evidence to allow a fact finder to reasonably disbelieve the Defendants articulated legitimate reasons for these actions.   Thus, Defendants' request for summary judgment on these claims must be denied.

With respect to Ms. Jordan's October 21, 2008 suspension, however, the court finds that Plaintiff has failed to establish a causal connection to a protected activity sufficient to survive summary judgement.  Although the suspension was temporally proximate to Ms. Jordan's October 6, 2008 complaints, the conduct for which Ms. Jordan was suspended – the harassment and profanity directed toward Ms. Healy recorded on a SEPTA Control Center line – occurred on September 12, 2008, prior to Ms. Jordan's complaints.  Importantly, the Defendants began the investigatory and disciplinary process prior to Ms. Jordan's October 6, 2008 complaint, as evidenced by the fact that Ms. Jordan was barred from work due to the violation when she made the October 6, 2008 complaints.  It is "well-settled" that when an employer "contemplates an

24

adverse employment action prior to the plaintiff engaging in a protected activity, the employment action itself does not provide evidence of a causal connection for the purposes of a retaliation claim." Mihalko v. Potter, 2003 WL 23319594, at *14 (W.D. Pa. Dec. 12, 2003) (collecting cases). Moreover, the discipline was ultimately imposed not by Mr. Kelly, but after a formal hearing by Hearing Officer David Rodgers, of whom Ms. Jordan makes no allegation of discriminatory or retaliatory animus. In fact, Ms. Jordan testified that she did not tell Mr. Rodgers about her PHRC complaint. (Jordan Dep. 181:22-182:1.) Finally, Defendants correctly point out that the discipline Ms. Jordan received following the incident with Ms. Healy was a "discrete response[] to [a] particular occurrence[]," rather than evidence of a pattern of antagonism. Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001), abrogated in part on other grounds by Burlington, 548 U.S. 53; see also Urey v. Grove City Coll., 94 F. App'x 79, 82 (3d Cir. 2004).

Similarly, Ms. Jordan's August 10, 2009 suspension constituted a discrete response to a particular occurrence, namely, her use of an unauthorized electronic device and earbuds in violation of SEPTA policy. There is no temporal connection between this suspension and any protected activity, nor is there any evidence that SEPTA's Director of Transportation, Mr. Carson, who presided over the informal hearing during which Ms. Jordan's suspension was imposed, harbored any animus toward her or was motivated by discrimination or retaliation. In fact, Mr. Carson agreed to all of the Union's requests regarding Ms. Jordan's discipline, and Ms. Jordan formally accepted the suspension in lieu of the originally proposed termination. Thus, Ms. Jordan offers no evidence of antagonism or animosity that would create a causal connection sufficient to survive summary judgment. Therefore, Ms. Jordan cannot sustain her *prima facie*

case with respect to the October 2008 and August 2009 suspensions.

Finally, with respect to the denial of sick benefits and her subsequent termination, the court finds that Ms. Jordan has proffered enough circumstantial evidence to "give rise to an inference of causation when considered as a whole." Marra, 497 F.3d at 302.  First, Ms. Jordan's August 13, 2009 PHRC complaint against SEPTA was still under investigation when the Defendants denied her sick benefits, insisted on classifying her as IOD, and ultimately terminated her for not complying with SEPTA policy applicable to employees on IOD status.  (See Pl.'s Ex. 27.)  Thus, there is a temporal connection between Defendants' actions and Ms. Jordan's protected activity.  Moreover, the court already determined in a previous decision that there is a genuine dispute over whether Ms. Jordan was entitled to sick benefits, or whether she was properly classified as IOD and required to visit a panel physician.  (See Mem. 2 n.5, Mar. 19, 2012.)  A reasonable fact finder could conclude that Ms. Jordan was entitled to sick benefits and that the circumstances surrounding SEPTA's denial of those benefits, and its termination of Ms. Jordan for failure to comply with a directive related to the IOD status SEPTA imposed upon her, was evidence of retaliation.

For those same reasons, a reasonable fact finder could conclude that SEPTA's legitimate, non-discriminatory reason for terminating Ms. Jordan – namely, her failure to comply with SEPTA's directive to consult a panel physician – was a pretext for discrimination.  Therefore, Ms. Jordan's retaliation claims based on Defendants' denial of sick benefits and her subsequent termination may proceed to determination by a jury.

However, to the extent that Ms. Jordan's Title VII retaliation claims have survived summary judgment, those claims must be dismissed as to defendant Kelly, because individual

employees cannot be held liable under Title VII.  See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996).

**C.** **Plaintiff's Section 1981 Claims (Counts 2 & 4)**

Ms. Jordan brings race discrimination and retaliation claims under Section 1981 against both Defendants for the same conduct described in her Title VII and PHRA claims.  As an initial matter, the Third Circuit has determined that Section 1981 provides no independent cause of action against state governmental units, like SEPTA.  See McGovern v. City of Phila., 554 F.3d 114, 121 (3d Cir. 2009); see also, Taylor v. Se. Pa. Transp. Auth., 2007 WL 1074887, at *2 (E.D. Pa. Apr. 5, 2007) (SEPTA is treated as a municipal agency in determining its liability under § 1983).  Rather, "the express cause of action for damages created by [42 U.S.C.] § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units."  McGovern, 554 F.3d at 121 (quotation and citation omitted).  Although SEPTA may be sued directly under Section 1983 for violations of Section 1981, it cannot be held liable for the acts of its employees under *respondeat superior* or any other theory of vicarious liability.  Taylor, 2007 WL 1074887, at *2 (citing Monell v. Dep't of Soc. Serv., 436 U.S. 658, 691-94 (1987)).  "SEPTA, as a government entity, can only be liable for an unconstitutional policy, custom or practice."  Id.  (citing Monell, 436 U.S. at 691-92).  Thus, in order to survive summary judgment on her Section 1981 claims against SEPTA, Ms. Jordan is required to show that SEPTA "'implement[ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated,' or acted 'pursuant to governmental 'custom' even thought such a custom has not received formal approval through the body's official decision-making channels.'"  McGovern, 554 F.3d at 121 (quoting Monell, 436 U.S. at 690-91).  Ms. Jordan has

made no allegations and offered no evidence in support of such a showing, and thus her Section 1981 claims against SEPTA must be dismissed.

Ms. Jordan's Section 1981 claims against Mr. Kelly follow the same standards set out for employer liability under Title VII and the PHRA.   See Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 597 (M.D. Pa. 2002) ("The standards of proof for a section 1981 case are . . . identical to the standards of proof for a Title VII case."); Verdin v. Weeks Marine, Inc., 124 F. App'x 92, 97 (3d Cir. 2005) (treating Section 1981 retaliation claim as identical to a Title VII retaliation claim).  Thus, the same analysis that applied to Ms. Jordan's Title VII and PHRA claims applies here.  For the same reasons Ms. Jordan failed to make out a case of discrimination under Title VII and the PHRA, her Section 1981 claim must fail.  Similarly, because Ms. Jordan met her burden under Title VII and the PHRA with respect to her retaliation claims based on her December 2007 removal from service, the July 2008 request for an evaluation, and her December 2009 denial of sick benefits and ultimate termination, those claims may also proceed against Mr. Kelly under Section 1981.

### D.   Plaintiff's Claims Under Section 1983 (Count 7)

"To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of state law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury."  Eldridge v. Municipality of Norristown, 828 F. Supp. 2d 746, 763 (E.D. Pa. 2011) (quoting Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005)).  Ms. Jordan alleges violations of several federal constitutional rights for which she seeks redress from the Defendants under Section 1983, namely, retaliation in violation of the First, Fourth, and Fourteenth Amendments, denial of equal protection in violation of the Fourteenth Amendment,

and, against SEPTA, failure to properly train and supervise Defendant Kelly.

      1.      <u>Section 1983 Claims Against SEPTA</u>

As discussed with regards to Ms. Jordan's Section 1981 claims against SEPTA, liability against SEPTA only attaches upon proof that the injury of which Ms. Jordan complains was caused by an official policy or practice.  <u>McGovern</u>, 554 F.3d at 121.  Because Ms. Jordan has offered no such proof, her Section 1983 claims against SEPTA must be dismissed.

      2.      <u>Section 1983 Claims Against Kelly</u>

      a.      *First Amendment Claims*

In order to sustain a retaliation claim under Section 1983 predicated on the First Amendment, Ms. Jordan must show that (1) she engaged in a protected activity, (2) the Defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising her rights, and (3) there was a causal connection between the protected activity and the retaliatory action.  <u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007).

The court has already determined, with respect to Ms. Jordan's Title VII and PHRA retaliation claims, that causation exists only as to  her removal from service in December 2007, the request for an evaluation in July 2008, the denial of sick benefits, and her termination.  Thus, the court must determine whether those actions were sufficient to deter a person of ordinary firmness from exercising her rights.  The denial of sick benefits and termination clearly satisfy this standard.  The removal from service in December 2007 and the request for an evaluation in July 2008 are a closer call.  There is no conclusive evidence as to whether Ms. Jordan was denied pay during her temporary removal from service.  A reasonable fact finder could determine that the action was sufficient to deter a reasonable person from exercising her rights.  The request for

an evaluation carried with it the threat of termination; it was explicitly requested to "determine [Ms. Jordan's] fitness for continuing employment as a bus operator."  (Pl.'s Ex. 5.)  The court concludes that, under the circumstances presented here, a reasonable fact finder could conclude that such a request was sufficient to deter a reasonable person from exercising her rights.

For these reasons, the Defendants' motion for summary judgment on Plaintiff's Section 1983 claim based on a violation of the First Amendment must be denied as to Defendant Kelly.

### b.      *Fourth Amendment Claims*

The Fourth Amendment recognizes "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  Ms. Jordan has made no allegations nor offered evidence in support of a violation of her Fourth Amendment rights. Therefore, her Section 1983 claim for violation of her Fourth Amendment rights is dismissed.

### c.      *Fourteenth Amendment Claims*

Pursuant to the Fourteenth Amendment, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  Ms. Jordan claims that the Defendants violated her rights by "depriv[ing] her of employment" and by "denying her equal protection." Thus, both the due process and equal protection rights encompassed in the Fourteenth Amendment are at issue here.

It is not clear whether Ms. Jordan alleges a violation of substantive or procedural due process in her Fourteenth Amendment due process claim.  The court need not resolve the matter, however, because Ms. Jordan cannot sustain either claim.  For Ms. Jordan to prevail on a

substantive due process claim, she must establish that she has a property interest protected by the Fourteenth Amendment.  Dennison v. Pa. Dep't of Corr., 268 F. Supp. 2d 387, 400 (M.D. Pa. 2003) (citing Nicholas v. Pa. State Univ., 227 F.3d 133, 140 (3d Cir. 2000)).  "The Third Circuit has limited review of property interests under the Substantive Due Process Clause to claims involving real property ownership."  Id.  Because Ms. Jordan's property interest is in her job, not in any real property, she cannot sustain a substantive due process claim.  See id.

With respect to a claim under Section 1983 for deprivation of procedural due process rights, Defendants correctly point out that Ms. Jordan was a union employee covered by a contract that provided a comprehensive grievance procedure involving her union and SEPTA. See Dykes v. Se. Pa. Transp. Auth., 68 F.3d 1564, 1571 (3d Cir. 1995).  In due process claims involving public employers where such procedures are in place, the Third Circuit has held that "those procedures satisfy due process requirements 'even if the hearing conducted by the Employer . . . [was] inherently biased.'"  Id.  (quoting Jackson v. Temple Univ., 721 F.2d 931 (3d Cir. 1983)).  Here, Ms. Jordan has not challenged the adequacy of the grievance procedures and after a review of the record, the court has not found any constitutional deficiencies. Therefore, Ms. Jordan cannot sustain a procedural due process claim.

"To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection [under the Fourteenth Amendment], plaintiffs must prove the existence of purposeful discrimination."  Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F. 3d 176, 196 (3d Cir. 2009) (quoting Andrews v. Phila., 895 F.2d 1469, 1478 (3d Cir. 1990)).  Ms. Jordan must "demonstrate that [she] received different treatment from that received by other individuals similarly situated."  Id.  As set forth above, the court cannot find any indication that Ms. Jordan

was discriminated against based on her race or gender, and Ms. Jordan has not come forth with evidence of similarly situated individuals who were treated differently.  Therefore, for the same reasons her Title VII and PHRA discrimination claims failed, her Fourteenth Amendment equal protection claim must also fail.  See Terrell v. City of Harrisburg Police Dep't, 549 F. Supp. 2d 671, 687 (M.D. Pa. 2008) (noting that "the evidence required to prove a protected-class equal protection claim is equivalent to that required for a Title VII disparate treatment case").  Moreover, Ms. Jordan's retaliation claims do not implicate the Equal Protection Clause of the Fourteenth Amendment.  See Stubbs v. Nutter, 2010 WL 3421015, at *3 (E.D. Pa. Aug. 30, 2010) ("As the Third Circuit has observed, '[a] pure or generic retaliation claim [] simply does not implicate the Equal Protection Clause.'") (quoting Thomas v. Independence Twp., 463 F.3d 285, 298 n.6 (3d Cir. 2006)).

Consequently, Defendant motion for summary judgment on Ms. Jordan's Section 1983 claims brought pursuant to the Fourteenth Amendment will be granted.

An implementing Order follows.